UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DIARRA DRUMMOND, #209424,

               Petitioner,

                                     Case Number 1:10-CV-11026
v.                                   Honorable Thomas L. Ludington

THOMAS BIRKETT,

               Respondent.
_____/

**OPINION AND ORDER DENYING PETITION FOR A WRIT OF
HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY,
AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

Petitioner Diarra Drummond was convicted by a Michigan state jury of bank robbery in violation of Mich. Comp. Laws § 750.531, and armed robbery in violation of Mich. Comp. Laws § 750.529. Sentenced to concurrent terms of 15 to 40 years imprisonment, he now petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition raises claims concerning the admission of other acts evidence, the sufficiency of the evidence to support his convictions, the effectiveness of trial and appellate counsel, double jeopardy, and trial court error. For the following reasons, the petition will be denied.

**I**

Petitioner's convictions arise from the armed bank robbery of the Standard Federal Bank located at Twelve Mile Road and Northwestern Highway in Southfield, Michigan on February 4, 2005. The trial testimony provided by Respondent was summarized on direct appeal in the state courts as follows:

Faiha Yaldo was a teller at Standard Federal Bank on February 4, 2005.  At approximately 3:45 to 4:00 p.m. when Yaldo was at her window helping a customer, she noticed a black male, medium height and wearing dark clothes and a dark hat, walk into the bank.  She particularly noticed this man because, when she finished with her customer, the man walked to her window ahead of other customers waiting in line.  Yaldo told the man he had to go back in line and wait his turn, and the man did so.  However, while Yaldo was helping the next customer, the man pushed the customer away and put a blue bank bag in her window.  The man then told Yaldo, "give me your money or I will blow up your bank."  Yaldo testified that she could not identify the robber with certainty because she was "so scared."  Yaldo did as the robber demanded and put money from her drawer into the bag.  The robber took the money and left.  Removing all of the money from Yaldo's drawer activated an alarm. (T Vol I 77) A dye pack was included in the stack of money given over to the robber.  Yaldo attended a line up that included Defendant, but she picked a different man as the robber.  She did not recognize Defendant.  Yaldo did identify a still photo taken from the surveillance video as showing the robber.  The photo shows the robber wearing a beard.

The surveillance video showing the robber was played for the jury.

Kathy Greer was also working as a teller at the Standard Federal Bank on Twelve Mile in Southfield on February 4, 2005.   At about 3:45–4:00 p.m., she saw a black male come into the bank and go to Ms. Yaldo's window.   Although she continued what she was doing, she realized that the man looked familiar.  The next thing she knew, the bank alarm was going off.  Greer testified that she had seen the man before, when she was robbed in December 2004.  Greer identified Defendant as the man she saw in December and February.  Greer testified that as soon as Yaldo said she had been robbed, the man was out the door running.  When asked the next thing she remembered, Greer testified: "I was like that was the same man, that's the first thing that came out of my mouth, that's the same guy."

Greer testified that in December, at about noon, as she was balancing the money in her drawer, she saw a black male come into the bank, "and he just looked like out of order" by the way he was dressed.  Greer explained that the person was dressed as a woman, "but you could tell it was a man."  She further described the man: "He had lipstick on.  He had on a, a wig, burgundy and black, long, with a bandana scarf and dark sunglasses."  Greer indicated that the man also had on a long coat and carried a satchel over his shoulder, and stated, "And I'm just like he's out of order."  Greer testified that the man walked up to her window and pulled a bag with a note taped to it from his satchel.  The note said something to the effect: "This is a hold up, robbery or some sort.  Don't say anything to no one, don't pull any alarms.  Give me all the cash."  Greer did as directed.  From a

photo . . . Greer identified one of two wigs in a dresser as being similar to the black and red one Defendant wore when he robbed her on December 2, 2004.

Greer picked Defendant out of the line-up.  Greer testified that she was able to identify Defendant by his nose, cheekbones and lips and stated that she remembered him even without the disguise. There was no doubt in Greer's mind that the person who robbed her on December 2nd was the same person who robbed Yaldo.  Oakland County Deputy Sheriff Jeremy Hendley testified that Greer was "rock solid" in her identification of Defendant at the line-up.

On February 4, 2005 around 4:00 p.m., George Molnar was driving on Twelve Mile Road between Inkster and Northwestern Roads.  As he prepared to turn left into an office parking lot, Molnar saw a "a black [male] dressed in dark clothes trying to negotiate the traffic at Twelve Mile" and thought "this person could really get hurt."  Molnar saw the man dart in front of traffic and run through the snow, and noticed that the man was carrying a satchel.  The man crossed Twelve Mile Road and went onto an office building property.  Molnar stated that it "clicks in my head that this person is . . . the same person I saw two months before."

Molnar testified that he was in the same vicinity in his office on December 2, 2004 just before lunch when a police officer with a tracking dog asked if he had seen anything suspicious.  Molnar told the officer that he had seen someone approach his office window about 15–20 minutes earlier.  Molnar stated that although the person was wearing a feminine type hat, a feminine coat and sunglasses, "I know it's a man."  Molnar further described the person as having long hair with some kind of bandana, very high cheekbones and a very broad nose.  The officer told Molnar that the bank across the street had just been robbed.

Molnar indicated that the person he saw on February 4, 2005 carrying a bag and running through the snow had the same height, build and complexion as the person he saw on December 2, 2004.  At the time, Molnar thought to himself, "it's the same guy robbing the bank."

Molnar drove into the office building parking lot thinking he would follow the man and then decided "that's not a wise move."  As he turned his car around, intending to flag down oncoming police cars, Molnar saw "a puff of red" in his rearview mirror.  Eventually Molnar met up with police in the parking lot next door, pointed out the direction the person headed, and saw a bag of money on the ground in the lot.  Molnar noted that behind the office building there was a solid cement wall with townhouses or apartments on the other side.  He had seen the person running through the parking lot heading toward the wall.

Southfield Police Sergeant Gary Lask and his partner Sergeant Louden responded to the February 4, 2005 bank robbery and were flagged down by a man driving an SUV.  The man stated that he just saw a subject running in a south direction

through office complexes on the south side of Twelve Mile.  The man pointed out where he last saw the subject running and the officers started checking the area on foot.  Nearby, the officers found a pile of money covered with what looked like an exploded red dye pack.  Police tracking with a canine started from that place.

As the tracking dog followed a path through the office parking lot, over the wall and into Pebble Creek, an apartment complex south of Twelve Mile, it passed a cellular phone in the apartment parking lot lying on the ground on top of some snow.  The phone appeared to be "freshly dropped there" because it was not wet.  The dog stopped its tracking about 30–40 feet into the apartment parking lot.  Southfield Police Officer Scott Kraemer recovered the cell phone from the snow behind the Pebble Creek apartment complex.  Southfield Police Detective Leo Moilanen obtained an address for the phone's owner.  The address was on Franklin Point Drive in Southfield.  Franklin Point Drive is no more than a half-mile from Pebble Creek Apartments and the Standard Federal Bank.

By the time the police arrived at the Franklin Point address at about 8:00 p.m., they had the name of a suspect, Diarra Drummond.  Mary Drummond, Defendant's mother, invited the officer's into her home.  Around the same time, Defendant arrived at the house.  The police were allowed to search all but Defendant's bedroom.  After a time, the police obtained a search warrant for Defendant's bedroom.

In the bathroom, the police found short hair clippings, either real or fake, in a wastebasket.  In a dresser in Defendant's bedroom, the police found a note that had a sketched map of the Twelve Mile and Northwestern area on one side and said, among other things, on the other side, "I have a live grenade.  Make no eye contact with anyone."  Also found in the bedroom dresser drawer were: two wigs, one was black with some red in it; nose putty; a variety of disguise makeup; scar wax; miscellaneous makeup directions; sunglasses; spirit gum; and a rubber bald cap.  Some of the putty and makeup packages were open.

In the clothes dryer, the police found a couple of black T-shirts, a black jacket, men's dark gray pants, and a pair of black sweat pants.  The items from the dryer were slightly damp.  On top of the dryer, the police found a black Kangol hat, a black "doo rag" and "a piece of thick clear tape stuck together" with writing on it including the word, "grenade."  The hat was consistent with the one worn by the robber as shown in the surveillance photo.  The pants had pink in the inside waistband, "which appeared that maybe they were in the washer and got discolored."

Defendant's motion for directed verdict was denied.

Defendant testified that he did not rob the Standard Federal Bank located in his neighborhood.  Defendant indicated that, in the past, he had been in that bank as a customer, but maintained that he had not been there since September 2004.  When

asked about his phone, Defendant indicated that it must have fallen from its clip when he walked to the gas station at Twelve Mile and Northwestern, about a block from the bank, to buy cigarettes. Defendant explained: "My telephone has a real cheap clip, and it's always falling out the clip. And I didn't realize I had lost my phone until I made it home." On cross-examination, Defendant described the route he took to get to and from the gas station. He agreed that his route would not have come close to the area where his phone was actually found in the snow. Defendant stated, "as far as how it got to where it ended up at, I have no idea how it got there."

Defendant explained that the make-up and nose putty found in his room were left over Halloween supplies he had for his niece and nephew. Defendant indicated that the wigs found in his room belonged to an ex-girlfriend, now deceased, with whom he had shared an apartment. Defendant explained that he did not pay any attention to the wigs when he packed up their belongings from the apartment. Defendant explained that the pants with some pink on them got that way "because they were washed with these red pants that I have on now." Defendant maintained that it was impossible for him to grow a beard. Defendant indicated that, other than trimming his mustache, he had not shaved in years.

On cross-examination, Defendant agreed that the hat in the February surveillance photo "does look like my hat." When asked about the presence of hair in the bathroom wastebasket, Defendant indicated that he believed it to be real hair rather than fake and explained that he is a barber with a suspended driver's license so his clients come to his home. Defendant had no idea how the clear tape with writing on it got into his house. However, Defendant agreed that he wrote the note found in his room with the words, "I have a live grenade" on one side of the paper and that he sketched a map on the other side. Defendant maintained that he had written the note and drew the map in June 2004 during a discussion with his now deceased girlfriend about a bank robbery at the nearby Franklin Bank.

The jury found Petitioner guilty of the charged offenses and he was sentenced as described above.

Following sentencing, Petitioner filed an appeal of right with the Michigan Court of Appeals. He raised claims concerning the admission of other acts evidence and the sufficiency of the evidence. The Michigan Court of Appeals affirmed Petitioner's convictions. *People v. Drummond*, No. 263560, 2006 WL 3375247 (Mich. Ct. App. Nov. 21, 2006) (unpublished slip op.). Petitioner filed an application for leave to appeal and a motion to remand with the

Michigan Supreme Court, which were denied in a standard order. *People v. Drummond*, 729 N.W.2d 873 (Mich. 2007) (unpublished slip op.).

Petitioner then filed a motion for relief from judgment with the state trial court raising claims concerning double jeopardy and the effectiveness of trial and appellate counsel. The trial court denied the motion pursuant to Michigan Court Rule 6.508(D)(3)(b)(i). *People v. Drummond*, No. 05-201193-FC (Oakland Co. Cir. Ct. Feb. 20, 2008) (unpublished slip op.). Petitioner moved for reconsideration, which was denied. Petitioner filed a delayed application for leave to appeal in the Michigan Court of Appeals, which was denied because he "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Drummond*, No. 290436 (Mich. Ct. App. May 8, 2009) (unpublished slip op.). Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was also denied. *People v. Drummond*, 774 N.W.2d 890 (Mich. 2009).

Petitioner now seeks habeas relief in this Court. First, Petitioner contends that he was denied a fair trial by the admission of "similar acts" evidence under Michigan state law. Second, Petitioner contends that his convictions for bank robbery and armed robbery must be reversed because the prosecution failed to present sufficient evidence to establish his guilt beyond a reasonable doubt. Third, Petitioner contends that his appellate counsel denied Petitioner's state and federal constitutional rights to effective assistance of counsel. Fourth, Petitioner contends that he was convicted twice of the same offense arising from the same act, violating his state and federal double jeopardy rights. Fifth, Petitioner contends that his trial counsel denied Petitioner's state and federal constitutional rights to effective assistance of counsel. Sixth, Petitioner contends that was deprived of effective assistance of counsel because his attorney did not move for suppression of evidence gained from a defective search warrant. And seventh,

Petitioner contends that the trial court abused its discretion by not analyzing the double jeopardy claim to make a determination about whether it qualifies as a "jurisdictional defect" exempt from the cause and prejudice standards and by finding that there was no ineffective assistance of appellate counsel.

## II

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (1996), which governs this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). As amended, 28 U.S.C. § 2254(d) permits a federal court to issue a writ of habeas corpus only if the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (1)-(2); *see Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir.1998). Mere error by the state court does not justify issuance of the writ. Rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520–21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotation marks omitted)).

Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also*

*West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) ("The court gives complete deference to state court findings of historical fact unless they are clearly erroneous.").

Emphasizing the limited scope of this review, the Supreme Court writes that "[a] state court's determination that a claim lacks merit precludes habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 785–86 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

### III

### A

Petitioner first asserts that he is entitled to habeas relief because the trial court erred in admitting other acts evidence — evidence of another bank robbery on December 2, 2004.

The Michigan Court of Appeals denied relief on this claim, finding that the other acts evidence was properly admitted under state law. *See Drummond*, 2006 WL 3375247 at *1. Errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1354 (6th Cir. 1993). As the Sixth Circuit explains, "Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action, unless the error renders the proceeding so fundamentally unfair as to deprive Petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (quoting *McGuire*, 502 U.S. at 69–70).

Additionally, the United States Supreme Court has not held that admitting "other acts" violates due process. *See Dowling v. United States*, 493 U.S. 342, 352–53 (1990); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) ("[T]here is no clearly established Supreme Court

precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence.").

Petitioner's first habeas claim lacks merit.

## B

Petitioner next asserts that he is entitled to habeas relief because the prosecution failed to present sufficient evidence to support his convictions. Specifically, he argues that the prosecution did not prove beyond a reasonable doubt that he was the perpetrator of the crime.

The standard of review for a sufficiency of the evidence challenge is whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted). "The *Jackson* standard must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n. 16). A federal court must also view this standard through the framework of 28 U.S.C. § 2254(d). *See Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002). Thus, under the AEDPA, challenges to the sufficiency of the evidence "must survive two layers of deference to groups who might view facts differently" than a reviewing court on habeas review — the factfinder at trial and the state court on appellate review — as long as those determinations are reasonable. *See Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). Accordingly, "[t]he mere existence of sufficient evidence to convict . . . defeats a petitioner's claim." *Matthews v. Abramajtys*, 319 F.3d 780, 788–89 (6th Cir. 2003).

The prosecution must, of course, prove beyond a reasonable doubt that the defendant committed the charged offense. *See People v. Kern*, 6 Mich. App. 406, 409, 149 N.W.2d 216

(1967) ("[P]roof of [the] defendant's connection with the alleged offense is an indispensable element of [the prosecutor's] duty."). Direct or circumstantial evidence and reasonable inferences arising from that evidence may constitute satisfactory proof of the elements of an offense, including the identity of the perpetrator. *See Dell v. Straub*, 194 F. Supp. 2d 629, 647 (E.D. Mich. 2002).

The elements of armed robbery under Michigan law are: (1) an assault, (2) a felonious taking of property from the victim's presence or person, (3) while the defendant is armed with a weapon described in the statute. *See* Mich. Comp. Laws § 750.529; *People v. Rodgers*, 248 Mich. App. 702, 707, 645 N.W.2d 294 (2001). And Michigan's bank robbery statute provides in relevant part:

> Any person who, with intent to commit the crime of larceny, or any felony, shall confine, maim, injure or wound, or attempt, or threaten to confine, kill, maim, injure or wound, or shall put in fear any person for the purpose of stealing from any building, bank, safe or other depository of money, bond or other valuables, or shall by intimidation, fear or threats compel, or attempt to compel any person to disclose or surrender the means of opening any building, bank, safe, vault or other depository of money, bonds, or other valuables, or shall attempt to break, burn, blow up or otherwise injure or destroy any safe, vault or other depository of money, bonds or other valuables in any building or place, shall, whether he succeeds or fails in the perpetration of such larceny or felony, be guilty of a felony.

Mich. Comp. Laws § 750.531.

Here, the Michigan Court of Appeals applied the *Jackson* standard and determined that the prosecution presented sufficient evidence to establish that Petitioner was the perpetrator of the crime. The court explained:

> The only issue in this case was the identity of the bank robber.
>
> Defendant claims the only evidence linking him to the bank robbery was his cell phone. In addition, three out of four bank employees who were witnesses to the robbery identified someone other than defendant at the line-up, including the bank teller who was robbed. However, the prosecution presented testimony that one of

-10-

the bank tellers was "rock solid" in identifying defendant as the perpetrator. Another individual also identified defendant as the person he saw running away from the bank. Defendant's cell phone was found in the area after a tracking dog tracked directly past it. A note stating, "I have a grenade. Make no eye contact with anyone," was found in defendant's bedroom, which was consistent with testimony that the robber said, "Give me your money or I will blow up your bank." On the other side of the note was a map of the area where the bank is located. Defendant had clothes in his clothes dryer that matched the description of the clothes worn by the robber, and one pair of pants had a pink stain on the waistband, consistent with the exploding dye pack from the bank. A Kangol hat on defendant's clothes dryer matched the hat worn by the robber. A wig found in defendant's bedroom matched the wig worn by the perpetrator of the prior bank robbery. We find that, viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence for a rational trier of fact to find defendant guilty beyond a reasonable doubt of bank robbery and armed robbery.

*Drummond*, 2006 WL 3375247 at *2.

This decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. Bank teller Faiha Yaldo testified that a black male entered the bank on February 4, 2005, put a blue bag under her window, and said, "give me your money or I will blow up your bank." She gave him the money with a red dye pack. Fellow bank teller Kathy Greer identified Petitioner as the person who committed the robbery of Yaldo that day and that he was the same person who robbed her in December, 2004. George Molnar testified that he saw a man running in the area after the bank was robbed and provided the police with a description of the man and his relative location. The police found a pile of currency with red dye in the area and recovered Petitioner's cell phone nearby. A search of Petitioner's residence uncovered clothes and a hat matching the robber's description in the dryer and the pants had pink on the waistband consistent with a red dye pack. The search also revealed cosmetic disguise materials, hair clippings, wigs matching those worn during both robberies, and a sketch of the area near the bank with a note on the other side saying, "I have a live grenade" and "make no eye contact with anyone."

This evidence was sufficient to support Petitioner's convictions for bank robbery and armed robbery. His second habeas claim lacks merit.

C

Petitioner next asserts that he is entitled to habeas relief because his convictions for bank robbery and armed robbery violate double jeopardy principles and because trial counsel was ineffective in several respects. The state court denied these claims as procedurally defaulted pursuant to Michigan Court Rule 6.508(d)(3)(b)(i).

Federal habeas relief is generally not available for claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *See Wainwright v. Sykes*, 433 U.S. 72, 85–87 (1977). The doctrine of procedural default is applicable when a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2006); *see also Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005); *Coleman v. Mitchell*, 244 F.3d 533, 539 (6th Cir. 2001). The last reasoned state court judgment is used to make this determination. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–05 (1991).

Petitioner first presented these claims to the state courts in his motion for relief from judgment. The Michigan Supreme Court denied relief pursuant to Michigan Court Rule 6.508(D). That rule provides that relief is unavailable to a defendant if the motion for relief from judgment alleges grounds for relief which could have been raised on direct appeal, absent a showing of good cause and actual prejudice resulting. *See* Mich. Ct. R. 6.508(D)(3).

The Sixth Circuit instructs that the form order used by the Michigan Supreme Court to deny leave to appeal (one such order was used in this case) is unexplained. *Guilmette v. Howes*, 624 F.3d 286, 291-92 (6th Cir. 2010) (en banc). Consequently, under *Guilmette*, this Court must

"look through" the unexplained order of the Michigan Supreme Court to the state trial court's decision to determine the basis for the denial of state post-conviction relief.

Here, the state trial court denied relief on procedural grounds, expressly citing Michigan Court Rule 6.508(D)(3)(b)(i).   Accordingly, Petitioner's double jeopardy and ineffective assistance of trial counsel claims are procedurally defaulted, unless he can demonstrate good cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991).  And this he does not do.

As cause to excuse the procedural default, Petitioner asserts ineffective assistance of appellate counsel.  Under the familiar standard, in order to establish ineffective assistance of counsel Petitioner must show "that counsel's performance was deficient . . . [and] that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In determining whether counsel's performance was deficient,

> [t]he court must . . . determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance . . . .  At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Strickland*, 466 U.S. at 690.   Judicial scrutiny of counsel's performance is thus "highly deferential."  *Id*. at 689.  The defense is prejudiced only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

A criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal.  *See Jones v. Barnes*, 463 U.S. 745, 751 (1983).  The United States Supreme Court has explained:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the . . . goal of vigorous and effective advocacy . . . . Nothing in the Constitution or our interpretation of that document requires such a standard.

*Id*. at 754. Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751–52). Appellate counsel may deliver deficient performance and prejudice a defendant by omitting a "dead-bang winner," defined as an issue which was obvious from the trial record and would have resulted in reversal on appeal. *Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003).

Here, Petitioner has not shown that by omitting the claims presented in his motion for relief from judgment appellate counsel's performance fell outside the wide range of professionally competent assistance. Appellate counsel presented legitimate issues concerning the admission of other acts evidence and the sufficiency of the evidence on direct appeal. Those issues, while not warranting reversal, were substantial and the claims presented in the motion for relief from judgment are not obviously stronger. In fact, appellate counsel may have reasonably decided not to pursue such claims due to their lack of merit.

In sum, Petitioner has not to demonstrated that appellate counsel was ineffective. Consequently, the Court need not address the issue of prejudice. *See Smith*, *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983). Nonetheless, the Court notes that Petitioner cannot establish prejudice, or that he is otherwise entitled to habeas relief, because the defaulted claims lack merit. For example, for reasons taken up next, Petitioner's convictions for bank robbery and armed robbery do not violate double jeopardy principles.

-14-

**D**

Petitioner next asserts that his convictions for both bank robbery and armed robbery violate his right to be free from double jeopardy under the state and federal constitutions. This claim lacks merit.

As an initial matter, Petitioner is not entitled to federal habeas relief on any claim that his convictions violate the Michigan Constitution. As noted, "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Rather, a federal court is limited to deciding whether a petitioner's conviction violates the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. § 2254(a).

Petitioner's federal constitutional claim is likewise unpersuasive. The Fifth Amendment of the United States Constitution, among its protections, provides "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life of limb." With these twenty words, the Double Jeopardy Clause confers three distinct protections:

> It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.

*Ohio v. Johnson*, 467 U.S. 493, 498 (1984) (internal alteration omitted) (quoting *Brown v. Ohio*, 432 U.S. 161, 165 (1977)). At issue here, as noted, is the final protection.

The protection against multiple punishments for the same offense, the Supreme Court instructs, is simply a function of the constitutional principle of the separation of powers: "Legislatures, not courts, prescribe the scope of punishments." *Missouri v. Hunter*, 459 U.S. 359, 368 (1983); *see Whalen v. United States*, 445 U.S. 684, 689 (1980) (citing *United States v. Wiltberger*, 5 Wheat. 76, 95 (1820); *United States v. Hudson & Goodwin*, 7 Cranch 32, 34 (1812)); *see generally* Akhil Reed Amar, *Double Jeopardy Law Made Simple*, 106 Yale L.J.

1807, 1818 (1997) ("The Eighth Amendment's Cruel and Unusual Punishment Clause might impose limits on the total amount of punishment that can be heaped upon a person for a single 'act' or series of acts, but the Double Jeopardy Clause imposes no limits on how the legislature may carve up conduct into discrete legal offense units." (footnote omitted)).

The Fifth Amendment is thus a check against the judiciary — it prohibits courts from imposing sentences exceeding "the limits prescribed by the legislative branch of government, in which lies the substantive power to define crimes and prescribe punishments." *Jones v. Thomas*, 491 U.S. 376, 381 (1989) (citing *Ohio v. Johnson*, 467 U.S. 493, 499 (1984). "Because the substantive power to prescribe crimes and determine punishments is vested with the legislature," the Supreme Court explains, "the question under the Double Jeopardy Clause whether punishments are 'multiple' is essentially one of legislative intent." *Johnson*, 467 U.S. at 499 (citations omitted) (citing *Hunter*, 459 U.S. at 366–368 (1983); *Wiltberger*, 5 Wheat. at 93).

When a state statute is at issue, as in this case, the state courts' interpretation of the statute controls. *E.g.*, *Ohio v. Johnson*, 467 U.S. 493, 499 (1984) ("We accept, as we must, the Ohio Supreme Court's determination that the Ohio Legislature did not intend cumulative punishment for the two pairs of crimes involved here."); *Missouri v. Hunter*, 459 U.S. 359, 368 (1983) ("[T]he Missouri Supreme Court has recognized that the legislature intended that punishment for violations of the statutes be cumulative.  We are bound to accept the Missouri court's construction of that State's statutes."  (citing *O'Brien v. Skinner,* 414 U.S. 524, 531 (1974)); *Brown v. Ohio*, 432 U.S. 161, 167 (1977) (quoting *Garner v. Louisiana*, 368 U.S. 157, 169 (1961)); *Banner v. Davis*, 886 F.2d 777, 780 (6th Cir. 1989) ("Under the double jeopardy clause, when evaluating whether a state legislature intended to prescribe cumulative punishments for a single criminal incident, a federal court is bound by a state court's determination of the

-16-

legislature's intent."   (collecting cases)); *Smith v. Sowders*, 848 F.2d 735, 739 (6th Cir. 1988)

(citing *Payne v. Smith,* 667 F.2d 541, 548 (6th Cir. 1981)).

The Michigan Court of Appeals has concluded that its state legislature "intended to

permit separate punishment for both armed robbery and bank, safe, or vault robbery." *People v.

Ford*, 687 N.W.2d 119, 128 (Mich. Ct. App. 2004); *see Blunt v. Woods*, --- F. App'x ----, 2012

WL 5870096 (6th Cir. Nov. 20, 2012) (per curiam) ("[T]he Michigan Legislature intended

multiple punishments for the same conduct in a prosecution for both bank robbery in violation of

MCLA § 750.531, and armed robbery in violation of MCLA § 750.529."); *Blunt v. Berghuis*, No.

4:08–CV–14808, 2011 WL 1330754, *3-4 (E.D. Mich. April 5, 2011) (same); *Graham v.

Ludwick*, No. 08-11117, 2010 WL 1257334, *7-8 (E.D. Mich. March 30, 2010) (same).

Because the Michigan legislature has authorized imposing punishments for both bank

robbery and armed robbery based on the same conduct,       Petitioner's   convictions   for   bank

robbery and armed robbery do not violate double jeopardy principles. Habeas relief is therefore

not warranted on such a basis.

### E

Petitioner next asserts that he is entitled to habeas relief because trial counsel was

ineffective for not impeaching Kathy Greer, for not properly challenging Faiha Yaldo's non-

identification of the robbery, and for not seeking to suppress of the evidence obtained from the

search of his residence because the search warrant was not signed by a judge or was forged.

As noted, to establish ineffective assistance of counsel, a petitioner must satisfy a two-

prong "*Strickland*" test. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  First, a petitioner

must demonstrate that counsel's performance was so seriously deficient — that counsel made

errors so serious — that he or she was not functioning as counsel as guaranteed by the Sixth

Amendment.  *Id.*   A petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance.  *Id.* at 690.

Second, Petitioner must establish that counsel's deficient performance prejudiced the defense.  *Id*.  To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

Here, Petitioner has not demonstrated that trial counsel erred, much less that he was prejudiced by counsel's conduct.  First, as to Kathy Greer, the trial transcripts reveal that counsel challenged her identification of Petitioner as the robber throughout the trial.  Counsel confronted Greer with the contrast between her police sketch and the line-up.  Counsel disputed Greer's ability to identify Petitioner by his cheekbones and nose.  Counsel emphasized Greer's guesses as to weight and height.   And counsel questioned Greer about the statement that she made to her employer indicating that she could only identify the robber if he were dressed the same way as when he committed the crime.

Second, as to Faiha Yaldo, the trial transcripts reveal that counsel questioned Yaldo about her inability to describe or identify the robber, emphasized that she picked another person at the lineup, and argued her lack of identification at trial.  Counsel also stressed that four witnesses identified four different people as the robber at the lineup.  While Petitioner asserts that counsel should have done more, he does not explain what more should have been done. And conclusory allegations are insufficient to establish that counsel was ineffective under the *Strickland* standard.  *See Cross v. Stovall*, 238 F. App'x 32, 39–40 (6th Cir. 2007).

Third, as to the search warrant authorizing the search of his room, Petitioner does not demonstrate that the search warrant lacked the proper signature of a state court judge.  The

search warrant indicates that a magistrate judge in the state trial court signed it and a letter from the court clerk states that Magistrate Judge Kay Spinks signed the search warrant. The fact that Judge Spinks' signature on another document looks somewhat different does not mean that her signature on the search warrant was forged. Petitioner's claim to the contrary is pure speculation. He has not established that counsel was ineffective for not contesting the search warrant on such a basis.

In sum, the Court's review of the record reveals that trial counsel's conduct in questioning the prosecution's witnesses, arguing the lack of reliable identification, challenging the prosecution's case, and presenting Petitioner's defense was a reasonable trial strategy and constitutionally sufficient under the circumstances of the case. The fact that counsel's strategy was ultimately unsuccessful does not mean that counsel was ineffective. *Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002). Petitioner has not established that trial counsel was ineffective. Habeas relief is not warranted on these claims.

Petitioner similarly asserts that he is entitled to habeas relief because appellate counsel was ineffective for not raising the foregoing issues on direct appeal in the state courts. Petitioner, however, is not entitled to habeas relief on an independent claim challenging appellate counsel's conduct. As discussed above, he has not established that appellate counsel was ineffective under the *Strickland* standard. And, moreover, the defaulted claims lack merit. Habeas relief is therefore not warranted on this claim.

**F**

Finally, Petitioner asserts that he is entitled to habeas relief because the state trial court, in deciding his motion for relief from judgment, did not properly rule on his claims. This is not a cognizable claim.

Federal habeas corpus relief is only available to persons being held in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). It is not a remedy for an alleged violation of state law. *Estelle*, 502 U.S. at 67. States "have no obligation to provide" post-conviction review under the federal constitution. *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987) (citation omitted). Consequently, challenges to a state's post-conviction procedures are not cognizable as independent claims in federal habeas proceedings because such claims "address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration." *Kirby v. Dutton*, 794 F.2d 245, 247, 248 (6th Cir. 1986). Simply put, alleged errors in state post-conviction proceedings "are outside the scope of federal habeas corpus review." *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007); *see also Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) (federal habeas petition cannot be used to challenge a state's scheme of post-conviction relief). Habeas relief is therefore not warranted on this claim.

## IV

Before Petitioner may appeal this Court's decision, a certificate of appealability must issue. 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484–85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the

underlying merit of the petitioner's claims.  *Id.* at 336–37.  Likewise, when a district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claims, a certificate of appealability should issue, and an appeal of the district court's order may be taken, if the petitioner shows that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.  *Slack*, 529 U.S. at 484.  When a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petition should be allowed to proceed further.  In such a circumstance, no appeal would be warranted.  *Id.*  "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rules Governing § 2254 Cases, Rule 1 1(a), 28 U.S.C. foll. § 2254.

Here, Petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a certificate of appealability is not warranted in this case. Petitioner will also not be granted leave to proceed in forma pauperis on appeal, as any appeal would be frivolous.  *See* Fed. R. App. P. 24(a).

## V

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus (ECF No. 1) is **DENIED**.

It is further **ORDERED** that a certificate of appealability is **DENIED**.

It is further **ORDERED** that permission to proceed in forma pauperis on appeal is

**DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: January 15, 2013

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney of record herein by electronic means and upon Diarra Drummond, #209424 at Kinross Correctional Facility, 16770 S. Watertower Drive, Kincheloe, MI 49788 by first class U.S. mail on January 15, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS